Your argument is SEC v. Traffic Monsoon. Thank you, Your Honor. May it please the Court and Counsel, my name is Lauren Washburn, and I represent Charles Scoville, and pursuant to a recent order from the District Court, represent for these purposes Traffic Monsoon as well. What was that recent order? Because that was an issue, whether Traffic Monsoon was properly before us. Yes, Your Honor. And the recent order, we filed a motion just within the last couple of days, but it's my understanding is not opposed to supplement the record with that recent order. It's a second amended order appointing the receiver. And the reason the District Court entered that order was, frankly, the District Court read the receiver's amicus brief and was concerned that perhaps this Court may find that some part of the claim, absent the right to assert certain arguments on behalf of Traffic Monsoon, that her receiver, that the original order and the amended receivership order. And the new order said. The new order gave. Just before court, we're all traveling and stuff. I'm sorry I missed that. No problem, Your Honor. The new order gave a specific grant and allowed Mr. Scoville to raise arguments before this Court related to the District Court's entry of the temporary restraining order, the preliminary injunction, and the order appointing receiver. Also, as a procedural matter, we filed an appeal to that second amended order appointing receiver. That's a separate case that we may move to consolidate. The issues are the same. We just needed to file that appeal. Did Traffic Monsoon consent to you representing them? Did the receiver? I mean, I haven't read the order just like Judge Hartz hasn't, but whatever the District Court did, did Traffic Monsoon agree that you could represent them? Well, that becomes a question. Can you answer yes or no to that? Does the record show that they said, we consent to you being our lawyer on this appeal? Because they didn't do that at the trial. No, Your Honor. So we've got a trial where you did not have the authority, and in fact, you stood up and said you are not representing Traffic Monsoon. So I don't even know if you can correct it now, but apart from that, does this order say that Traffic Monsoon hereby signs an agreement that you can represent them on appeal? It does not. Okay. All right. Okay. If I can get into – I'm happy to entertain any additional questions on that that the Court would like, but if I can get into the substance, Your Honor, there are three issues that we presented in our appeal. And two of them I'll address briefly, but the main issue I intend to address is the Morrison issue. So the three issues are that the Court found that this product, an ad pack, that was sold by Traffic Monsoon was a security. And as we raised in the District Court and in our briefs here, we believe that was an error because the District Court ignored fundamental aspects of the product, specifically the advertising. Second, the District Court – the second error is the District Court – Well, it is the – I mean, the advertising isn't even a factor for many of the investors. Many of them didn't even have websites of their own. And also, the work that was required for them in the advertising was for one traffic pack, and you could get more money for multiple traffic packs with no additional clicks required at all. So for those additional investments, there was no effort at all required. Certainly, the returns, it allowed you to perform the same number of daily tasks in order to qualify multiple ad packs as to qualify one ad pack, which I think is the Court's point there. And I do understand that, Your Honor. Nonetheless, we believe that those aspects, the aspects of having to perform a task, are sufficient to take this out of the realm of being a security. As I mentioned, that's not – those arguments are in the brief, and I would prefer – We have bigger fish. That's right. Go ahead. Well, let's go with fish that I'd rather fry, whether bigger or not. The second issue, which is also a fish that I'm only going to temporarily fry, if I may, is the Ponzi scheme issue. There, the District Court fundamentally found that Traffic Monsoon operated as a Ponzi scheme. And the problem with that, the lack of evidentiary basis for that, is that we demonstrated during the hearing on the preliminary injunction that Traffic Monsoon would be perpetually solvent according to the promises it actually made its customers. And the only way that Traffic Monsoon would become insolvent is if you imputed promises that weren't made. Well, you had this bonus thing going on so that there ended up being more money owed than they were bringing in because they weren't bringing in new money. Well, actually, Your Honor – And that sort of starts to feel like a Ponzi scheme because you have to keep getting new money to cover your old debts. Actually, the way that the promises that Traffic Monsoon made were that it would – if you qualified on a given day, you would receive a portion of the revenues that Traffic Monsoon made the previous day. So if Traffic Monsoon today made no revenue, if you qualified tomorrow, you would be entitled to no revenue. You know, the problem with that for me is that you're focusing on the promises made by – let's assume for the moment it is a Ponzi scheme – the promises made by a person in a Ponzi scheme who's trying to defraud people by making false promises. And if you can make a promise that says we will only follow the law, we will do nothing that's illegal, we will only pay you out of honest efforts, and if that's an immunization, then no matter what they do, they can't ever be a Ponzi scheme. And it seems to me that what we have to look at here is not just the promises made, but the practice that was followed, which is going to speak louder than promises, which might have indicated to people that those promises weren't genuine or weren't sincere and that, in fact, payments were being made steadily, constantly, and that that is what was the de facto promises rather than the words in a document. I think the distinction here, though, Your Honor, is that the promise being made about receiving money, what people were told, you will get a share of revenues, but that was dependent on future revenues. And that's the imputation of a promise that you would perpetually be entitled to money that was never made by Traffic Monsoon. So that's the issue on the Ponzi scheme. If I can move on to the Morrison issue, which I think is the key issue that we believe is here before the Court. In 2010, the Supreme Court decided the Morrison v. National Australia Bank case. In lower courts, the Second Circuit specifically had found that the district court lacked subject matter jurisdiction over the case. And the Supreme Court, at the beginning of its opinion in Morrison, took time to make a very clear distinction between jurisdictional issues and subject matter. And it said that, in fact, under the Supreme Court looked at the jurisdiction statutes in the Exchange Act and said under the Exchange Act, there was jurisdiction here. The problem isn't a jurisdiction problem. It's a merits problem. It's a prohibited conduct problem. The question the Supreme Court said was, what conduct is actually prohibited by 10b in the Exchange Act and 10b-5? And the Supreme Court found that 10b did not prohibit conduct that took place outside of the United States. Well, it said there were two preconditions. Either it prohibited conduct related to securities sold on an exchange within the United States or sales that took place in the United States. And that was the law. Purchase or sale. Purchase or sale. That's correct, Your Honor. And that was the law at the time that the Morrison decision came down. And the SEC here argues that that's no longer the law. And the reason they argue that's no longer the law is due to Section 929 of the Dodd-Frank Act. And that section, by its very terms, addresses jurisdiction. It addresses in- But there's something more, it seems to me. Morrison said that to have extraterritorial effect, it didn't require you, it didn't require Congress to explicitly state this was extraterritorial, this has extraterritorial effect. It required its intent to be clear. And it did. The Supreme Court rejected what they call the clear statement ruling, Morrison. Yes, yes. So if the intent of Congress is clear that this should have extraterritorial effect, then that'll work. Congress, not having the Morrison opinion before it when it passed the statute, seems to me made its intent very clear that the statute is supposed to have extraterritorial effect. It did it improperly by putting it in jurisdictional language, which wasn't the problem in Morrison. But isn't that a very clear, it's not a clear statement in terms of being explicit, but it clearly conveys the intent of Congress, does it not? Well, what it doesn't address, Your Honor, is I think if we were sitting around just chatting and saying, well, you know, what do we think Congress was really trying to do, that may be a question that I think would be worth addressing. But here, what we have is a statute that in order to get to that question of asking, well, what was Congress's intent here, we need to read the statute and determine, the SEC argues that it's ambiguous because a clear application of the actual language of the statute would render it a nullity. I think that's inaccurate. But here, before you get to that step of asking what's Congressional, what was the Congressional intent in passing Dodd-Frank, you have to get past the fact that the language itself deals clearly and specifically only with jurisdiction. And if the, particularly in the context of its being enacted while Morrison is up being litigated still, do you really have any, can a reasonable person have any doubt that Congress wanted the security, the 10B, to apply to extraterritorial conduct? Well, I think by the plain. Under the terms of the jurisdictional language in Dodd-Frank. Under the terms of the jurisdictional language, yes. I think that if you just look at the statute that Congress passed, there's significant, there is room for doubt there. Because the difference, if you look at the plain language of the Dodd-Frank Section 929 and you compare it to the statutory regime before that the Supreme Court said gave the district court sufficient jurisdiction to hear the, to hear the case. They said, look, you had jurisdiction to hear it. That wasn't the problem. And then you look at what did Dodd-Frank do. And what Dodd-Frank did is it said extraterritorial jurisdiction is permissible with the conduct and effects test. What it actually did, the actual language of Dodd-Frank removed from the jurisdiction of the district court territory that it had before. That is things taking place outside the United States without conduct and effects. Okay. It appears from Justice Scalia that they had jurisdiction to hear that before. Okay. And Dodd-Frank. And that may help you to some extent. But don't we read 10b in light? Well, I'm repeating myself. Well, and I understand if the court already had jurisdiction under 10b, what was the purpose of this statute? Well, the purpose of the statute, as I mentioned, the effect of the statute, if you read it, the statute is not a nullity. The actual language of the statute takes what I just mentioned to Judge Hart, takes a category of conduct that is extraterritorial conduct without conduct or effects in the United States and deprives the district courts of jurisdiction that they previously had. Which would be the exact opposite of what Congress intended. Well, that may be correct. But we don't get there because the plain language of the statute is sufficiently clear and is susceptible to a direct application such that we don't get into the statutory interpretation of asking what was it that Congress, what was it that Congressman X said on the floor on date Y? The – I think it also blurs the distinction. The SEC's position here blurs what Justice Scalia went to great lengths to make a very clear distinction between jurisdictional issues and that subject matter. Justice Scalia made very clear that – Very clear distinction. That's correct. And I think – Well, the question is what it says about Congress and how it wanted to be interpreted. Certainly. If there are no other questions, I think we've covered the territory that it makes sense to cover here. You have a minute left for rebuttal. Thank you. William Shirey for the United States Securities and Exchange Commission. Do you want to raise the mic since you're – there's a button to your – there you go. A little bit. Thank you. Thank you. William. Let me ask you about an interesting argument that I oppose in counsel. If you have what would otherwise be a Ponzi scheme and you're promising a 15% return and you're able to pay that just because new investors are coming in, but you say you'll get 15% as long as money's coming in and when money stops, you'll only get so much, would that still be a Ponzi scheme? I believe absolutely, Your Honor. The critical consideration for a Ponzi scheme is where the profits are coming from, or where the revenue that's being paid out to the original investors is coming from. We see that in this court's case law, in fact. I believe it's the Sander v. Simon decision, which is a case where no specific guaranteed monies were held out. People were entitled to a share of the profits that were generated from an algorithm. An investing algorithm. And this court had no problem finding in Sander, but it was a Ponzi scheme. The court said the critical distinction or the critical defining trait of a Ponzi scheme is are the profits coming from the legitimate business activities or the profits coming from the continued sale and resale of securities? Well, the Ponzi scheme is predicated on fraud of the 33 and 34 Act. But what if there was no fraud? What if somebody said this is a typical Ponzi scheme? We make no money except the money that new investors come in. We invite you to be one of the early investors. And if you think you're smart enough to figure out that you're an early investor and not a late investor, come in and you're going to make a lot of money out of later investors. Later investors caveat emptor. If you get in too late, you may lose money. But until the crash, you're all going to get a 20 percent per month return. That is clearly money not. I mean, that clearly is a Ponzi scheme, but there's no fraud. Would that be illegal under the 33 and 34 Act or not? Your Honor, I doubt anyone would even invest in such. Oh, I don't know. I think a lot of people would think they'd be the early investors. I think you get rich quick. The critical consideration. Can you answer that question? Would that be illegal under the 33 and 34 Act when there is no fraud but clear disclosure? If you affirmatively told people this is a Ponzi scheme, get in early. Well, you might not use the word Ponzi, but you would say we are making no revenue except the revenue that later investors provide. Your Honor, that might be a difficult case for the SEC. That sounds just like the chain letters that were so popular in my youth. What I can say, Your Honor, comfortably. I'm serious. Chain letters must have come up. Were those ever prosecuted? I'm not able to say off the top of my head. I apologize, Your Honor. And are you able to say off the top of your head that my hypothetical is or is not a Ponzi scheme? I think it would be, again, I just want to say I think it would be a very difficult case to win. It would depend on the specific facts and circumstances to determine if there were other misrepresentations. Fraud is essential to a Ponzi scheme. That's correct. But the misrepresentation could trump any statements in the document. The document might say there that we're really, you know, we're trying to make money and you're only entitled to money if we make it. But then the actions could speak louder than the disclaimers in the document itself because you fact find out that you're getting money every month. That's correct, Your Honor. But here we have something even different. Here we have Mr. Scoville representing to the public that the revenue that was coming in, 98 percent of the revenue that was coming in here was from the ad facts. What Mr. Scoville was representing on his web page, and we talk about this in our brief, is that the high demand products were the advertising services, these things that are separate and apart from the ad facts. That was only 2 percent of their business. I think it generated a sum total of about $3 million and some change. Where the money was generated here was the ad facts. It was about $173 million. And what we see through the preliminary evidence that the Commission has put forward and what the district court relied on and found and did not abuse its discretion in so finding is that the revenues overwhelmingly were coming from the exponential sale of more and more of these investments. And that was not disclosed to the public. That's from a scienter aspect. That's pure recklessness because the defendants knew that the public thought that the revenues were coming from these sale of other products, what you would think of as the legitimate aspect or the sham aspect of the Internet advertising enterprise that they were engaging, rather than just churning more and more and more securities out. So that's a massive distinction from what Your Honor posited. If I can turn to Section 929P, what Congress added in Don Frank, Your Honor had it exactly right. Section 929P added the affirmative indication, and those are the exact words from the Morrison decision, the affirmative indication of congressional intent that was missing when the court approached the scope of the anti-fraud provision in the Exchange Act. There, there was no language about cross-border or extraterritorial effect. As a result, the court found silence, and the court applied the presumption against extraterritoriality, which in the Morrison decision the court refers to as a presumption about a statute's meaning. We don't get to that presumption any longer. This court has to go through the same exercise that the Morrison court did because it has a new statute in front of it. So what exactly is the difference between the Dodd-Frank definition of extraterritorial reach and the Morrison requirement for extraterritorial reach? Well, specifically, the Dodd-Frank language actually says that it applies, and I'm quoting now, or I think I'm virtually quoting, even if the transaction occurs outside the United States. That is fundamentally inconsistent with what the Supreme Court said in Morrison with respect to language because there they said… But you said it applies if there is a foreseeable and substantial effect on the U.S. Correct. Didn't Morrison also have a similar effect test? No, Morrison rejected that effect test. Morrison said it didn't matter how much effect there was in the United States. It didn't matter how much conduct there was in the United States. Only one thing had to occur in the United States, and that's potentially two things, a purchase or sale on a U.S. securities exchange or an off-exchange transaction within the United States. A what? An off-exchange transaction within the United States. And that is flatly… A purchase or sale of any security. Correct. And that is flatly inconsistent with what Congress expressly said when it added the affirmative indication of extraterritorial scope through the new language that 929PB inserted into the Securities Act, the Exchange Act, and the Investment Act. And, Your Honors… Well, again, what is the difference? I mean… Right. Do you have to have only one entity within the United States for the SEC to act here, either the purchaser or the seller? So, under the Morrison test, you would have to have either the purchaser or the seller engaging in irrevocable actions in the United States for the exchange to occur. Now, under the Conducts and Effects test, you can have the mastermind sitting right here in the United States, doing all the planning, all the conduct, every single step up to the transaction. He or she gets on a plane, flies to a foreign country, and there the parties sign the agreement. That would potentially escape the Morrison transactional test because there would be a very strong argument, potentially, that the transaction occurred overseas. What Congress wanted to get away from by providing the Commission and the Department of Justice with more expansive jurisdiction, this broader Conducts and Effects test, is not forcing the Commission and the Department of Justice to look at every… because these schemes involve massive numbers of transactions. This scheme alone involved millions of transactions. Where those specific transactions occurred. Do you think that both tests would have been satisfied here? Your Honor, as we demonstrate in our belief, we believe both tests are… In this case, do we really have to get into the parsing of which test applies? Your Honor, Congress thought it was, and I think you guys, I think you sort of, you indicated this. Congress had an affirmative indication that they wanted the Conducts and Effects test to apply to the Commission. And I think it is appropriate and sort of respectful of Congress's wishes that this Court defer to Congress and explore the Conducts and Effects test. And there's no dispute here that if this Court applies that test, the defendants don't dispute it, that it's met here. So in either instance, whether we go under Morrison or Dodd-Frank, we're still applying a Conducts and Effects test. But you're just saying under Dodd-Frank it's read more broadly. No, no. I apologize, Your Honor, if I was understood to say that. Under Dodd-Frank, this Court would apply a Conducts and Effects test. Under Morrison, this Court would apply a much more limited standard, at least a 10B. Transactional. But what I'm having trouble with, a transaction is conduct. So when we are looking at a transaction, we are looking at conduct, which is what Dodd-Frank said. So it really, this great divide that everybody is so concerned about, I see a lot of melding of the two tests. Your Honor, there is definitely some melding. But let me give this Court an example of a case that the Second Circuit dealt with that I believe the transactions occurred overseas. It was SEC versus Berger. It was a Second Circuit decision where we had a gentleman in New York who was engaged in the fraud. Right in New York, he was planning every single step of it. But he was executing the transactions through his Bahamas, through his Caribbean hedge fund. And he was executing it, I believe, with foreigners. That would escape. That's huge. That allows someone to sit right in the United States and leaves the SEC utterly powerless to shut down that fraud. And there's other ways that this is important, Your Honor. Because the transactions were overseas. The conduct was overseas. No, Your Honor. But it would not escape Dodd-Frank because the effect was in the U.S. Your Honor, there was the massive portion of the conduct, almost all of the conduct, with the exception of the consummation of the transaction was in the United States. The masterminding of it was in the United States. It's not just conduct in the United States. It's specific types of conduct. It's a very narrow sliver of conduct. It's the transactions. And let me give you another example of where it's really important to the Commission and why I think Congress really wanted courts and the Commission to apply the Conducts and Effects Test. There are situations, I've seen them as an attorney at the Commission, where we're able to capture part of a fraud, a massive fraud. But these frauds involve myriad different structures within the transactions. They're often orchestrated from the United States. But when it comes time to decide on disgorgement, which is the ill-gotten gains, we're only able to trace those transactions. And the Commission has to go through an extensive process to trace each transaction and to show that it occurred in the United States. Or we leave ill-gotten gains in the hand of a defendant who's often in the United States, who orchestrated the same exact fraud, but it just so happened, through the happenstance of how he or she structured that transaction, that massive amounts of ill-gotten gain from innocent victims are left in their hands. And that's what Congress wanted to prevent. Was this website set up in the U.S.? Was the server that operated the website in the U.S.? The server was in the United States. I believe it was operated out of Atlanta in North Carolina. There were several servers. When the offers were posted on the website, that was out of a server in the U.S.? That was out of a server in the United States. What if Traffic Monsoon had instead contracted with a server outside the U.S., somebody in India, with a separate website there and did all the transactions there? Would that have escaped U.S. reach then? So, Your Honor, we believe that the answer is both on the conducts and effects test, the answer is no. And we believe on the Morrison transactional test, the answer is no. And I'm happy to explain that very briefly. The conduct would be captured in the United States, because now we're looking at not just the transaction, when we're applying the conducts and effects test, that broad test that Dodd-Frank provides. We have the mastermind, Mr. Scoville, sitting in the United States, and Traffic Monsoon in the United States, it's only a Utah corporation, daily engaging in the fraud. So that is substantial conduct in the United States on the conduct piece of it. So moving to the Morrison transactional test, that's a bit more of an open question, and this is one of the difficult questions in why we think this court should go the conducts and effects route. But we talk about in our brief the Uniform Electronic Transfer Act, which has been applied by 47 states, and under that statute, which is a generally widely held standard for determining where contracts and electronic transactions occurred, those transactions, even if the server were in, I think you posited India, even if the server were in India, because the place of business that was most closely associated with those transactions was in the United States under the principles articulated in that statute. Wouldn't your argument be stronger here to rely on where Mr. Scoville was located and where he generated this plan, and that's all in Utah? I'm puzzled why you go with the server argument. We do not. I just want to be clear. We're not going with the server argument. We think that the district court had it exactly right. The district court looked at the location of Traffic Monsoon. Traffic Monsoon is the person who's selling the transactions, and we think that's what this court should do. There was no argument to the contrary in the opening brief, so to the extent that there may be some argument that Mr. Scoville had incorporated Traffic Monsoon in India. If Traffic Monsoon were in India, Your Honor? If Traffic Monsoon had been incorporated in India and not in the U.S., would they have escaped free in this case? Under the conducts and effects test, with respect to the overseas investors, if they were in India and they were selling to, and Mr. Scoville were there in India with them, and they were selling to the 90 percent of investors who were overseas, the commission would have grave difficulty going after them. But remember, 10 percent of investors were still in the United States, so we have the effects piece of the conducts and effects test. If 10 percent were in the U.S., would that give you, the commission, only the reach for 10 percent pullback, or would that 10 percent give you the reach over the whole 100 percent, or because 90 percent was not in the U.S., would you have no reach over it? Your Honor, to be perfectly frank, we haven't explored that question because that's not the situation. I think the commission would primarily, to be perfectly honest, consistent with its mission to protect U.S. investors and to prevent fraud in the U.S. markets, I think the commission would be, you know, I don't want to speak out of turn here, but I think they would primarily be focused on the 10 percent. So, I can't answer it precisely. I wish I could, but I think the focus from a practical point of view would be on the 10 percent, if it were the situation. Thank you. Are there any further questions, Your Honor? Thank you. Thank you so much. Thank you. If you could add two and a half minutes. Thank you, Your Honor. To answer a question that I believe you asked, Your Honor, in our brief, in our opening brief, we make the representation, which is supported in the record, that Mr. Scoville actually resided in the United Kingdom during this entire time. He had a home that he owned there. His wife was there. In the SEC's brief, they represent, and this is also reflected in the record, that he was in Utah at least once a month. He had a son in Utah and an ex-wife in Utah, and he would come to visit Utah. Any evidence of where this plan was hatched, if it was in Utah? I don't believe there was any evidence in the record. Certainly, the district court relied on the fact that Traffic Monsoon was a Utah LLC. I would recommend to the court the Absolute Activist case. And the reason I would recommend that is I think it will clear up some of what may, what I perceive to be, confusion about the difference between the Conducts and Effects test and the Morrison test. And the reason it clears that up is that 929 only deals with cases brought by the Commissioner of the Department of Justice, even on its own terms. Absolute Activist was a case between private litigants in the Second Circuit. It's cited in our brief. And in Absolute Activist, one of the issues was the fact that the buyers of the securities were buying securities directly from the issuing corporations, which I believe were in California. They were domestic corporations. And the question that the Second Circuit looked at was what is it, when we talk about where a transaction took place. So, in other words, if we're asking that question of, hey, under either test, does it matter which test we apply? The answer from Absolute Activist, I believe, is clearly yes. Because Absolute Activist is looking under Morrison and saying, because there Morrison clearly applies. 929 has nothing to do with it because it's private party litigation. And they say, well, where does a transaction take place? And the Second Circuit said, a transaction takes place where irrevocable liability occurs, where the parties incur irrevocable liability. And here, as we argued in our brief, that happened at the place where the purchaser was. Because there's not irrevocable liability when someone puts an offer on a website. Well, there's the or, isn't there? Or when title is passed within the United States. If title is passed within the United States, that would certainly be true as well. And I don't believe the Commission provided any evidence during the preliminary injunction hearing of where title passed. I think all of the arguments were where irrevocable liability accrued. I know he's used his time.  Go ahead, sure. I think my trouble of differentiating between the Morrison test and the Dodge Frank test is in the articulation that the labels they've given to those tests. I think you're trying to clarify for me that we shouldn't be focused on the labels, but rather the application of the test. If you just look at the labels, Morrison is a transactional test. But a transaction means where you engage in certain conduct. When you look at Dodge Frank, it is conduct in effect. Conduct includes a transaction. So it seems to me that from a labeling point of view, they both are looking at the same thing. If I step back from the labels used for those two tests, I think I just want you to tell me if I'm correctly understanding this. That it is more correct to look at Morrison as a legal test of where does this legal enterprise, as a matter of law, get consummated. Whereas under Dodge Frank, we are looking at an effect test. This is not a law exam of where the parties legally made a contract. But rather, where do the effects of the contract, where are they felt? Would that be kind of the substantive difference between those two tests or not? And if it's not, right, please tell me what is right. I think that it's largely right. And if I may borrow the analogy that Mr. Shirey used that I think he borrowed from me in the transcript before the district court, he'll tell me afterward if that's true, I'm sure. We'll all agree. The analogy is this. If I came to you and said, invest in Ponzi Inc. It's the greatest thing ever. And you said, I'd love to invest in Ponzi Inc. And I pitched it to you here in Denver. And then we got on a plane and we flew to Mexico. And you signed the documents in Mexico. There would be conduct here in the United States. There would be effects here in the United States. And therefore, under the conduct and effects test, that transaction would be covered. But under Morrison, the question is, where did the sale take place? Where did the transaction take place? And under Morrison, the transaction took place when we signed the documents in Mexico. That's the absolute activist decision of irrevocable liability. And so under Morrison, if I pitch you Ponzi Inc. here in the courtroom, and if you're interested, let me know later, and then we fly to Mexico and we sign it, then that transaction took place in Mexico. So that goes back, I mean, that kind of, I think, affirms what I'm saying, that under Morrison, you say, this is a law exam, a law school exam. Where did the parties enter into a legal contract? That's correct. And under the Dodd-Frank, it's not a law school exam. It's a question you would ask your high school senior, which is where were parties hurt? Where were parties helped? Where did parties act to suck people in or not? I think that's about right. The conduct and effects test, there are so many courts out there that it gets convoluted, but I think you're on to the distinction. I think that's a fair summation of the distinction, Your Honor. Okay. And thank you very much. Thank you. Thank you all for your arguments this morning. The case is submitted. Court is in recess until 2 o'clock this afternoon.